## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | |
|---|---|
| SETH ECKHARDT, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, *et seq.*** |
| v. | **JURY TRIAL DEMANDED** |
| STATE FARM BANK, F.S.B., | **ECF CASE** |
| Defendant. | |

Pursuant to Fed. R. Civ. P. 23, Plaintiff Seth Eckhardt brings this class action individually and on behalf of all other persons in the United States who, upon purchasing a cryptocurrency from Coinbase.com or another online crypto merchant, incurred cash advance fees and/or cash advance interest charges on a consumer credit card issued by Defendant State Farm Bank, F.S.B. ("State Farm" or "Defendant"). Plaintiff makes the following allegations based on the investigation of his counsel, and based upon personal knowledge as to himself and his own acts and dealings with State Farm. Plaintiff and his counsel believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      In recent years, so-called "cryptocurrencies" such as Bitcoin, Litecoin, and Ethereum have gained public attention for their potential technological applications to the future of business and finance. Many consumers view cryptocurrencies (or "cryptos") as a technology that could eventually help replace conventional, government-issued money. As of today, however, cryptos are not money; they are a technology, mere computer programs stored on computers. Cryptos are not created or issued by the U.S. government or any other government. They are not issued or created by any regulated financial institution, nor are they recognized as legal tender in any foreign or domestic jurisdiction.

2.      Nonetheless, many consumers have come to view cryptos as the future of money, or at the very least, the future of financial technology. For that reason, some consumers have come to ascribe tremendous economic value to owning cryptos. When and if cryptos become money in the conventional sense, some consumers want to be found owning them, largely because cryptos

differ from conventional currency in one important respect. Every type of cryptocurrency is programmed to be finite in number and ultimately fixed in supply.

3.    Bitcoin, the first ever cryptocurrency, was released as open-source software in 2009 by an anonymous person, or group of persons, under the pseudonym "Satoshi Nakamoto." Since 2009, several other cryptocurrencies have been invented by various tech experts seeking to improve upon and/or offer alternatives to the Bitcoin concept. Some of the more popular cryptos available for public purchase include Litecoin, Ethereum, and Ripple. All have grown in notoriety and value over the last several years, as the concept of cryptos has spread from a fringe group of tech experts into the general public consciousness.

4.    As the cryptocurrency wave began to propagate from a small segment of computer science gurus, into the media, and then to consumers at large, tech-savvy entrepreneurs saw an opportunity. On a largely *ad hoc* basis, entrepreneurs began to develop new technological and economic infrastructures to support the buying, selling and exchange of cryptos nationwide.

5.    Among such "infrastructure" businesses was a now-prominent website called "Coinbase" (www.coinbase.com). Coinbase today serves as one of the largest cryptocurrency exchanges in the United States. Coinbase.com is owned and operated by San Francisco-based Coinbase, Inc., a privately held company that allows consumers to buy and sell cryptocurrencies using an intuitive, user-friendly online interface.

6.    For the last few years, Coinbase has allowed consumers to purchase cryptos online using their personal credit cards. Throughout these years, Defendant State Farm and other major banks likewise permitted their credit card customers to purchase cryptos online. Whenever State Farm's credit cardholders did this, State Farm processed their crypto purchases from Coinbase and other merchants as ordinary credit card "Purchases."

7. But beginning in January 2018, State Farm decided to do something very different. State Farm began treating its customers' crypto purchases not as ordinary credit card "Purchases" — as it had for years — but instead as "Cash Advances" from State Farm to the credit cardholder. When State Farm implemented this change in January 2018, State Farm did so in total silence. State Farm provided no notice to its cardholders that their crypto "Purchases" would suddenly be treated as "Cash Advances" on a going forward basis.

8. Plaintiff and other Class members began using their State Farm-issued credit cards to purchase cryptos in and before 2017, when such purchases had always been treated as "Purchases." Plaintiff and other Class members had been using their credit cards to buy cryptos, not because they needed to borrow money in the first place, but instead because it was the only way to acquire cryptos instantly via Coinbase and other merchants. Purchasing cryptos with a bank account number would typically require several days of processing time. Consequently, consumers had long been using their State Farm credit cards to buy cryptos simply to avoid unnecessary delays in delivery. For years, State Farm consistently treated its cardholders' crypto purchases as ordinary "Purchases" under State Farm's standard form cardholder agreements.

9. As a result, in and after January 2018, Plaintiff and the Class simply continued to do what they had been doing for years: making routine crypto purchases via Coinbase and other merchants using their State Farm credit cards. Unbeknownst to Class members, however, they were now taking out personal cash loans from State Farm, complete with new fees and sky-high interest rates (well over 20% annually). Those ultra-high finance charges began accruing *immediately* on the transaction date, rather than after the end of a billing period, as with an ordinary purchase. Based on Plaintiff's and the Class's longstanding experiences with State Farm under their cardholder agreements, Plaintiff and the Class believed they could pay off their crypto

purchases before their credit card due-dates without incurring any finance charges.  But Plaintiff and the Class were duped.  State Farm silently smacked them with instant cash advance fees, plus much higher interest rates than normal, and left them without any recourse.

10.    In sum, the complete lack of notice to State Farm's cardholders regarding this change caused them to unknowingly incur millions of dollars in cash advance fees and sky-high interest charges on each and every crypto purchase.  State Farm's silent bait-and-switch squarely violates the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), which aims to ensure that consumers obtain credit from financial institutions based on their informed consent.  Had State Farm notified its cardholders, as required by law, in advance of making these changes to their credit card terms, Plaintiff and the Class would not have incurred millions of dollars in cash advance fees and interest charges by taking out personal cash loans from State Farm without their knowledge or consent.

11.    Plaintiff and the Class seek, *inter alia*, a complete refund of all cash advance-related charges levied against them by State Farm in connection with their recent crypto purchases.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.  The claims asserted herein arise under and pursuant to the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* and the United States Consumer Financial Protection Bureau's "Regulation Z" promulgated thereunder, codified at Title 12, Part 1026 of the Code of Federal Regulations.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Defendant State Farm Bank, F.S.B. resides and transacts business in this District, and maintains its principal

executive offices within this District. Many of the acts that constitute the violations of law complained of herein occurred in substantial part in this District.

## PARTIES

14.    Plaintiff Seth Eckhardt is a resident of Alabama and has been a State Farm credit cardholder since 2017. Mr. Eckhardt opened his State Farm credit card account in or before 2017. He made numerous purchases of cryptos on Coinbase.com using his State Farm-issued credit card during 2017. Up until January 2018, State Farm treated all of Mr. Eckhardt's purchases from Coinbase as ordinary credit card "Purchases" under his cardholder agreement. But when Mr. Eckhardt made an additional crypto purchase from Coinbase, using the same State Farm credit card on February 4, 2018, State Farm designated this purchase as a Cash Advance, and assessed at least $40.00 in "Cash Advance Fees," plus daily Cash Advance interest charges at an annual percentage rate ("APR") of well over 20%. Plaintiff called State Farm's customer service line to complain about the surprise charges on his account, but State Farm declined to remove them. State Farm told Mr. Eckhardt that it "reserved the right" to change its credit card fee structure at any time *without notice to cardholders*.

15.    Indeed, at no point did State Farm even attempt to notify Mr. Eckhardt — neither before nor immediately after he executed his latest crypto purchase — that such purchases would be deemed "Cash Advances" rather than "Purchases" under his cardholder agreement. Had Mr. Eckhardt known that State Farm was going to begin designating his customary crypto Purchases as Cash Advances, then Mr. Eckhardt would not have used his State Farm credit card to buy cryptos on February 4, 2018, and would not have incurred the cash advance fees and interest charges that State Farm has levied against him.

5

16.    Defendant State Farm Bank USA, F.S.B. is domiciled in Illinois and is one of the larger federal savings banks and credit card issuers in the United States.  In January 2018, State Farm abruptly altered its customers' credit card terms — without notice — such that any crypto purchases made by credit cardholders would be designated as Cash Advances rather than Purchases, as they had been throughout 2017 and prior years.

17.    From its own database records, Defendant knew that many of its customers had been using their State Farm credit cards to purchase cryptos from Coinbase and other online crypto sellers.  Yet State Farm made no effort whatsoever to notify its cardholders that they would begin incurring lofty Cash Advance fees and interest charges on all future crypto purchases.  During recent weeks, Plaintiff Eckhardt and other Class members have called State Farm's customer service line to complain about these surprise fees and interest charges.  When Plaintiff and other State Farm credit cardholders have done so, State Farm has responded by summarily (and deceptively) placing the blame on Coinbase, and by claiming the right to unilaterally alter its cardholders' fee structures without notice.

## SUBSTANTIVE ALLEGATIONS

18.    State Farm issues a number of consumer credit cards to customers nationwide, such as the State Farm Rewards Visa, State Farm Good Neighbor Visa, and State Farm Student Visa credit cards.  As far as is relevant to this action, all State Farm-issued credit cards come with substantially identical credit card agreements.  At all relevant times, each State Farm credit card agreement has set forth the applicable interest rates and fees (if any) that apply to different types of credit card transactions.  Each agreement offers some variable annual percentage rate (or "APR") for ordinary "Purchases," and a substantially higher APR for so-called "Cash Advances."

Unlike regular "Purchases," "Cash Advances" incur transaction fees and substantially higher interest rates.

19.    At all relevant times, with respect to ordinary "Purchases," every State Farm credit card agreement has stated: "**Purchases.**  You may use your Card to purchase or lease goods or services ("Purchases") from merchants who honor Visa credit cards."  (emphasis in original)

20.    At all relevant times, with respect to "Cash Advances," every State Farm credit card agreement has stated: "Quasi-cash transactions, described below, are deemed to be Cash Advances and not Purchases."   State Farm's credit card agreements then describe "Cash Advances" as follows:

(1) You may use your Card to obtain a Cash Advance at most banks that display the Visa logo.

(2) You may use your Card, in conjunction with the personal identification number ("PIN") we will issue to you, to obtain a Cash Advance at automated teller machines ("ATMs") that bear the Plus logo.  The operator of the ATM may add a surcharge to the amount of the Cash Advance you request.  If so, the surcharge will be part of the Cash Advance charged to your account.

(3) You may use your Card to establish overdraft protection on a checking account if permitted by your financial institution.  You obtain a Cash Advance each time your card is used to fund such an overdraft.

(4) We may send you blank forms of convenience checks or cash advance checks ("Convenience Checks" or "Checks") from time to time.  If we do, you may use a Check to obtain a Cash Advance by signing and completing the Check in accordance with the terms on the Check and any written materials that accompany it.  You obtain a Cash Advance each time you use a Check and we pay it when it is presented to us, including when you use a Check to purchase or lease goods or services.

(5) You may obtain a Cash Advance when you use your Card for items that are convertible to cash or similar cash-like transactions *that we may designate from time to time*, including wire transfer money orders, other money orders, travelers checks, or foreign currency or tax payments (so-called "quasi-cash transactions").  However, your Card may not be used to obtain, and we will not honor requests for, a Cash Advance in the form of casino chips, bets or wagers, gaming transactions (including Internet gambling), lottery tickets or the like.

7

(6) Certain establishments may cash your personal checks upon presentment of your Card.  In the event we are required to pay the amount of a check cashed in this manner because your check is not paid for any reason, we may charge your Account for a Cash Advance in the amount of the check and any processing charge we incur.

(emphasis added)

21.     Throughout and before 2017, State Farm consistently did ***not*** "describe" or "designate" crypto purchases as "Cash Advances" or "quasi-cash transactions"; instead State Farm had long designated all crypto purchases as regular "Purchases" under its cardholder agreements.

22.     By way of example only, on November 25, 2017, Plaintiff used his State Farm credit card to buy cryptos from Coinbase for $1,099.  State Farm approved and designated this transaction as a standard "Purchase," and sent Plaintiff a credit card statement dated December 26, 2017 reflecting the same.  State Farm did not assess any "Cash Advance" fees or interest charges on this purchase.

23.     On November 29, 2017, Plaintiff used his State Farm credit card to buy cryptos from Coinbase for a total of $650.  State Farm approved and designated these transactions as standard "Purchases," and sent Plaintiff a credit card statement dated December 26, 2017 reflecting the same.  State Farm did not assess any "Cash Advance" fees or interest charges on these purchases.

24.     On December 6, 2017, Plaintiff used his State Farm credit card to buy cryptos from Coinbase for $850.  State Farm approved and designated this transaction as a standard "Purchase," and sent Plaintiff a credit card statement dated December 26, 2017 reflecting the same.  State Farm did not assess any "Cash Advance" fees or interest charges on this purchase.

25.     On December 22, 2017, Plaintiff used his State Farm credit card to buy cryptos from Coinbase for $125.  State Farm approved and processed this transaction as a standard

"Purchase," and sent Plaintiff a credit card statement dated December 26, 2017 reflecting the same. State Farm did not assess any "Cash Advance" fees or interest charges on this purchase.

26.    Nevertheless, beginning in or about January 2018, State Farm elected to begin "designating" all crypto purchases as ***"Cash Advances"*** rather than standard "Purchases" for all of its cardholders, including but not limited to the Plaintiff. At no point did State Farm even attempt to notify Plaintiff or its other cardholders of this change. Had State Farm notified Mr. Eckhardt that it would begin, or had recently begun, designating crypto purchases as "Cash Advances," then Mr. Eckhardt would not have used his State Farm credit card to purchase cryptos on or after the date of this change. Instead, because Plaintiff received no notice, he continued to use his same State Farm credit card to buy cryptos from Coinbase on February 4, 2018, believing that this purchase — like every similar purchase he had made in the past — would be fee-free and subject to his 0% promotional APR for purchases.

27.    On February 4, 2018, Plaintiff used his same State Farm credit card to buy cryptos from Coinbase for $1,000. This time, without prior notice, State Farm approved and designated Plaintiff's crypto purchase as a ***"Cash Advance,"*** and hit Plaintiff with a surprise cash advance fee of $40, as well as instant, daily interest charges amounting to well over 20% APR. Plaintiff's State Farm credit card statement dated February 26, 2018 reflects the same.

28.    At no point did State Farm attempt to notify Plaintiff in advance of his transactions that State Farm intended to begin — or had recently begun — assessing "Cash Advance" fees and interest charges on all of his and everyone else's crypto purchases. Instead, State Farm simply stuck Plaintiff with the bill, after the fact of his transactions, and insisted that he pay it. Plaintiff called State Farm's customer service line to dispute these fees and interest charges, but State Farm

9

refused to remove them, instead claiming the unilateral right to alter its cardholders' fee structures without prior notice.

29.     During and after January 2018, State Farm assessed the same surprise cash advance charges against hundreds if not thousands of other cardholders like Plaintiff.  Plaintiff and the Class routinely purchased cryptos from Coinbase and other online crypto merchants, without knowing that State Farm would assess hefty "Cash Advance" fees plus immediate interest charges of over 20% APR.  Had Plaintiff and the Class been notified of this in advance, as required by law, then they would not have continued using their State Farm credit cards to purchase cryptos.

30.     State Farm's "gotcha" cash advance fees and interest charges against Plaintiff and the Class violate the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") and Regulation Z promulgated thereunder by the CFPB.  TILA and Regulation Z require credit card issuers, including State Farm, to give their cardholders 45 days written notice before implementing any "significant change" to cardholders' credit card terms.  15 U.S.C. § 1637(i)(2).  "Significant change[s]" expressly include cash advance fees, as well as any other finance charges that apply to different types of transactions.  By not even attempting to notify (let alone effecting notice to) Plaintiff and the Class before assessing new "Cash Advance" fees and interest charges against Plaintiff and the Class, State Farm squarely violated TILA and Regulation Z, which aim to "assure the meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him ***and avoid the uninformed use of credit***."  15 U.S.C. § 1601(1) (emphasis added).

31.     Had State Farm notified Plaintiff in or before Ferbuary 2018 of its abrupt change to Plaintiff's credit card terms, then Plaintiff would not have used his State Farm credit card to buy cryptos, and would not have incurred these substantial "gotcha" fees and interest hikes.

Plaintiff seeks complete relief from these cash advance charges, on his own behalf and on behalf of all other Class members.

## CLASS ACTION ALLEGATIONS

32.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities in the United States who, upon purchasing a cryptocurrency from Coinbase.com or another online crypto merchant, incurred cash advance fees and/or cash advance interest charges on credit cards issued by State Farm Bank, F.S.B.  Excluded from the Class are State Farm, the officers and directors of State Farm, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which State Farm has or had a controlling interest.

33.    The members of the Class are so numerous that joinder of all members is impracticable.  Leading up to and during January and February 2018, hundreds if not thousands of State Farm credit card members used their State Farm cards to purchase cryptos from Coinbase and other online crypto merchants for millions of dollars, collectively.  While the exact number of Class members is unknown to Plaintiff at this time, and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Members of the Class may be identified and located from database records maintained by State Farm and may be notified of the pendency of this action by electronic mail and/or regular mail, using the form of notice similar to that customarily used in class actions.

34.    Plaintiff's claims are typical of Class members' claims, as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of law, as complained of herein.

35.    Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

36.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether State Farm violated TILA by declining to notify Plaintiff and all other Class members in advance of its sudden, unilateral change to their credit card terms;

b.    whether State Farm, in fact, failed or declined to provide Class members with advance written notice of its sudden, unilateral change to their credit card accounts;

c.    whether Plaintiff and the Class suffered damages as a result of State Farm's conduct, and the proper measure of such damages; and

d.    whether Plaintiff and the Class are entitled to statutory damages, as well as reasonable attorneys' fees and expenses as a result of Defendant's wrongful conduct.

37.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation would make it difficult if not impossible for members of the Class to redress the wrongs done to them on an individual basis.  There will be no difficulty in the management of this case as a class action.

## COUNT I
### (Violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and Regulation Z Promulgated Thereunder)

38.  Plaintiff hereby repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

39.  The Truth in Lending Act, at 15 U.S.C. § 1637(i)(2), requires credit card issuers to "provide a written notice of any significant change, as determined by rule of the [U.S. Consumer Financial Protection] Bureau, in the terms . . . of the cardholder agreement between the creditor and obligor, not later than 45 days prior to effective date of the change."

40.  Pursuant to its express authority under 15 U.S.C. § 1637(i)(2), the Consumer Financial Protection Bureau ("Bureau") promulgated 12 C.F.R. § 1026.9(c)(2) which provides the following "Rules affecting open-end (not home-secured) plans," *i.e.*, credit card plans:

(i)  Changes where written advance notice is required.

(A)  General.  For plans other than home equity plans . . . , when a significant change in account terms as described in paragraph (c)(2)(ii) of this section is made, a creditor must provide a written notice of the change at least 45 days prior to the effective date of the change to each consumer who may be affected.

12 C.F.R. § 1026.9(c)(2)(i).  Section 1026.9(c)(2)(ii) then defines "Significant changes in account terms" as follows:

For purposes of this section, a "significant change in account terms" means a change to a term required to be disclosed under § 1026.6(b)(1) and (b)(2), an increase in the required minimum periodic payment, a change to a term required to be disclosed under § 1026.6(b)(4), or the acquisition of a security interest.

12 C.F.R. § 1026.9(c)(2)(ii).  The credit card account terms specifically enumerated in 12 C.F.R. § 1026.6(b)(1), (b)(2) and (b)(4) include, but are not limited to, the following:

13

Transaction charges.  Any transaction charge imposed by the creditor for use of the open-end plan for purchases.

12 C.F.R. § 1026.6(b)(2)(iv).

Cash advance fee.  Any fee imposed for an extension of credit in the form of cash or its equivalent.

12 C.F.R. §1026.6(b)(2)(vii).

Type of transaction.  The type of transaction to which the [interest] rate applies, if different rates apply to different types of transaction.

12 C.F.R. § 1026.6(b)(4)(i)(C).

41.    By consistently desginating Plaintiff's and the Class's crypto purchases as "Purchases" under its card member agreements, and not imposing cash advance fees or interest charges — then changing Plaintiff's and the Class's routine crypto "Purchases" to be designated as "Cash Advances" overnight in January 2018 — State Farm made a "significant change" to Plaintiff's and the Class's credit card terms within the meaning of 15 U.S.C. § 1637(i)(2) and Regulation Z.

42.    Upon making this significant, overnight change to Plaintiff's and the Class's credit card terms in January 2018, State Farm did not provide advance written notice of the change as required by 15 U.S.C. § 1637(i)(2) and Regulation Z.

43.    Had State Farm provided Plaintiff and the Class with advance notice of its changes as required by TILA and Regulation Z, then Plaintiff and other Class members would not have used their State Farm credit cards to purchase cryptos from Coinbase or other merchants on or after the effective date of such changes.  Consequently, Plaintiff and the Class would not have incurred State Farm's surprise "Cash Advance" fees or interest charges, effectively taking out personal cash loans from State Farm without their knowledge or consent.

44.    Pursuant to 15 U.S.C. § 1640(a), Plaintiff brings this claim on his own behalf, and on behalf of the Class defined above, to recover his and the Class's actual financial damages, plus

14

statutory damages in the aggregate amount of $1 million, plus his costs of this action and reasonable attorneys' fees and expenses incurred therein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative, and the law firm of Finkelstein & Krinsk LLP as Class Counsel;

B.    Requiring Defendant to pay the actual damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the Class additional statutory damages in the aggregate amount of $1 million pursuant to 15 U.S.C. § 1640(a);

D.    Awarding Plaintiff and other members of the Class prejudgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees and other costs and expenses of this litigation; and

E.    Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 2, 2018                     Respectfully submitted,


                                       FINKELSTEIN & KRINSK LLP


                                       By:  ___s/ David J. Harris, Jr._____
                                              David J. Harris, Jr., Esq.

                                       550 West C Street, Suite 1760
                                       San Diego, California 92101-3579
                                       Telephone: (619) 238-1333
                                       Facsimile:  (619) 238-5425
                                       Email: djh@classactionlaw.com

                                       *Counsel for Plaintiff and the Putative Class*